Raymond FREIER, Individually, as Administrator of the Estate of Rose Freier, deceased, and as surviving spouse of Rose Freier, Arthur L. Phillips, Administrator of the Estate of Leo Phillips, deceased, and Dorothy Phillips, as the surviving Spouse of Leo Phillips, Tab Fuqua, Charlotte Mucha, individually, as Executrix of the Estate of Alfred G. Mucha, deceased, and as surviving spouse of Alfred Mucha, John Farino, Administrator of the Estates of Mary Jane Farino and Robert Farino, deceased, Grace Astor, individually, and as surviving spouse of Evo T. Astor, Harry Basinski, Sr., Ellen Basinski, his spouse, Kathy Kaminski, Administratrix of the Estate of Joseph Inzinna, deceased, Mary Ylmar, Marie Manolis, Executrix of the Estate of Louis Manolis, deceased, and individually as the surviving spouse of Louis Manolis, legal representative of the Estate of Leo Ott, deceased, and Administratrix of Mary M. Sturm, deceased, William Neilsen, Betty Barabasz, Executrix of the Estate of George Pagels, deceased, Gloria Pagels, Individually as the surviving spouse of George Pagels, Joseph Grandillo, executor of the Estate of Stephen Grandillo, deceased, Shirley Kuczka, Executrix of the Estate of Henry Kuczka, deceased, and individually as the surviving spouse of Henry

Kuczka, Mary Ann Boxhorn, Executrix of the Estates of Leo and Annabel Foisset, deceased, Eileen Folts, Administratrix of the Estate of Helen Hancock, deceased, Franklin Mueller, Flora Mueller, his spouse, Robert S. Fiels, Delores Fiels, his spouse, Irene M. Marino, legal representative of the Estate of Anthony J. Marino, deceased, and individually as the surviving spouse of Anthony J. Marino, deceased, Nancy Forman, Carl P. Forman, Sr., her spouse, Joseph J. Wiedenbeck, Jr., legal representative of the Estates of Isabelle A. Wiedenbeck and Joseph J. Wiedenbeck, Sr., deceased, Linda Kistka, legal representative of the Estate of Nelson M. Hirsch, deceased, Nelly Anthony, legal representative of the Estate of Diane Anthony, deceased, Eleanor Jasinski, legal representative of the Estate of Leocadia Jasinski, deceased, George Scherrer, Jr., legal representative of the Estate of George Scherrer, Sr., deceased, Marie Scherrer, individually as the surviving spouse of George Scherrer, Sr., deceased, Veronica A. Zawatski, legal representative of the Estate of Robert Zawatski, deceased, and individually as surviving spouse, Michael Lamancuso, Marlene Lamancuso, his spouse, Thomas Szyplman, legal representative of the Estate of Victoria Szyplman, deceased, Geraldine Davies, Morley P. Davies, her spouse, Kevin Batt, individually, as Administrator of the Estate of Charles W. Batt, deceased, and Executor of the Estate of Rose E. Batt, deceased, Patricia Batt, his spouse, Donna McKowan, Donald McKowan, her spouse, Norman Wagner, Patricia Wagner, his spouse, Eileen Ewert, Administratrix of the Estate of Evo T. Astor, deceased,

Thomas F. Hewner, public Administrator of the Estate of Lorraine E. Brzezicki, deceased, Lawrence Heaney, legal representative of the Estate of Gretchen Heaney, deceased, Marie Martzolf, Executrix of the Estate of Robert Martzolf, deceased, and individually as surviving spouse, and Jacqueline Mongiovi, Executrix of the Estate of Vincent Mongiovi, deceased, and individually as his surviving spouse, Plaintiffs–Appellants–Cross–Appellees,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Allied Waste Systems, Inc., formerly known as Laidlaw Waste Systems, Inc., Dresser Industries, Inc., American Standard, Inc., Carborundum Company, and E.I. Dupont de Nemours & Co., Inc., Defendants–Appellees–Cross–Appellants,

General Motors Corporation, Curtiss–Wright Corporation, Warner–Lambert Company, and Ford Motor Company, Defendants–Third–Party–Plaintiffs–Appellees–Cross–Appellants,

Litton Systems, Inc., Defendant-Third-Party-Defendant-Appellee-Cross-Appellant,

Browning–Ferris Industries, Inc., Defendant–Cross–Appellant,

Trico Products Corporation, Occidental Chemical Corporation, Waste Management of New York, Inc., Niagara Mohawk Power Corporation, and New York State Electric & Gas Corporation, Third–Party–Defendants–Cross–Appellants,

Howden Fan Company, formerly known as Buffalo Forge Company, Defendant–Appellee,

W.S. Tyler Inc., Defendant,

Lancaster Stone Products Corp., Paul M. Pfohl, Pfohl Brothers, Pfohl Enterprises, Bryan Pfohl, and Town of Cheektowaga, Third–Party–Defendants.

United States of America, Intervenor.

Docket Nos. 00–7724(L), 00–7728(XAP).

United States Court of Appeals, Second Circuit.

Argued: Feb. 15, 2001.

Decided: Aug. 15, 2002.

Steve Jensen, Dallas, TX (Laura J. Van Pelt, Baron & Budd, Dallas, TX, on the brief), for Plaintiffs–Appellants–Cross–Appellees.

Laurie Styka Bloom, Buffalo, N.Y. (Mark A. Molloy, Nixon, Peabody, Buffalo, NY, on the brief), for all Cross–Appellants.

R. Justin Smith, Attorney, Environment & Natural Resources Division, United States Department of Justice, Washington, DC (Lois Schiffer, Assistant Attorney General, Stephen J. Sweeney, Attorney–Advisor, Environmental Protection Agency, John A. Bryson, Environment & Natural Resources Division, United States Department of Justice, on the brief), for Intervenor.

Herzfeld & Rubin, New York, N.Y. (Michael Hoenig, Noreen M. Giusti, New York, NY, Hugh F. Young, Jr., The Product Liability Advisory Council, Inc., Reston, VA, of counsel), filed a brief on behalf

of Amicus Curiae The Product Liability Advisory Council, Inc., in support of Appellees.

Before: KEARSE, LEVAL, and KATZMANN, Circuit Judges.

Judge LEVAL concurs, in a separate opinion.

KEARSE, Circuit Judge.

Plaintiffs Raymond Freier *et al.* appeal from a judgment entered in the United States District Court for the Western District of New York pursuant to Fed. R.Civ.P. 54(b), Richard J. Arcara, *Judge,* dismissing certain of their state-law tort claims alleging that personal injuries to themselves and their decedents were caused by toxic substances transported to and maintained in a Cheektowaga, New York landfill. The district court granted partial summary judgment dismissing those claims as untimely, ruling that under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9675 (1994 & Supp. V 1999), as amended by § 203 of the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9658, plaintiffs' claims accrued when they knew or with reasonable diligence should have known that the injuries resulted from exposure to hazardous substances deposited in the landfill, *see In re Pfohl Brothers Landfill Litigation,* 26 F.Supp.2d 512 (1998) (*"Pfohl I"*), but also ruling that plaintiffs should have suspected the cause of their injuries no later than the end of 1991 and that therefore, even under 42 U.S.C. § 9658, their claims, asserted beginning in 1995, were barred by the relevant statute of limitations, *see In re Pfohl Brothers Landfill Litigation,* 68 F.Supp.2d 236 (1999) (*"Pfohl II"*). On appeal, plaintiffs contend principally that the court erred in ruling as a matter of law that they should have known no later than the end of 1991 that their injuries were caused by the landfill. They also contend that the

court erroneously applied a one-year, rather than a three-year, limitations period.

Various defendants and third-party defendants have cross-appealed, urging that the judgment be affirmed *in toto* on the ground that 42 U.S.C. § 9658, to the extent that it alters state law as to the starting date of a state limitations period on state-law claims, is unconstitutional under the Commerce Clause and the Tenth Amendment of the Constitution. They also urge partial affirmance on the ground that § 9658 is inapplicable to claims involving the death of a plaintiff's decedent. The United States has intervened in this Court, arguing for the constitutionality of § 9658.

For the reasons that follow, we conclude that the district court properly rejected defendants' statutory-interpretation and constitutional challenges to § 9658 and that it properly found that plaintiffs' claims were subject to the pertinent one-year limitations period. However, we conclude that there are triable issues of fact as to the time when plaintiffs reasonably should have known that the landfill materials were the cause of the injuries. Accordingly, we vacate and remand for further proceedings.

## I. BACKGROUND

The present actions concern injuries alleged to have resulted from the maintenance of a landfill owned and operated principally by third-party-defendants Pfohl Brothers and Pfohl Enterprises (the "Pfohl Landfill" or "Landfill") in Cheektowaga, which is adjacent to Buffalo, New York. The Pfohl Landfill is a 120–acre area used for waste disposal. It borders Aero Lake, a fishing and swimming site, and is within a few hundred feet of Ellicott Creek, which is fed by three tributaries that flow through the Landfill. Ellicott Creek empties into the Niagara River, an

international waterway between the United States and Canada. Since at least 1983, the Landfill has been listed in the New York State Registry of Active Hazardous Waste Disposal Sites.

## A. *The Parties and the Claims*

The present actions, consolidated in the district court for all pretrial purposes *sub nom. In re Pfohl Brothers Landfill Litigation*, were commenced by the filing of several essentially identical complaints between January 1995 and January 1997 by more than 60 plaintiffs on behalf of themselves or their respective decedents, alleging that the injured parties suffered from various cancers caused by exposure to toxic wastes deposited in the Pfohl Landfill. The complaints alleged that most of the plaintiffs had lived or worked in the immediate vicinity of the Landfill or had engaged in recreational activities near the Landfill. Many of the plaintiffs had used the Landfill area as an access route to Aero Lake; their children had often played in the Landfill; and residential properties were sometimes flooded when Ellicott Creek overflowed.

The defendants are companies that, between 1946 and 1969, either sent hazardous waste materials from their manufacturing operations to the Landfill or transported hazardous substances to, and deposited them in, the Landfill. Plaintiffs alleged that the cancers were caused by exposure to hazardous substances released from the Landfill through the air and water and/or released by the defendant transporters on their way to the Landfill. The complaints asserted survival, wrongful death, personal injury, and loss-of-consortium claims under New York State law, and requested compensatory and punitive damages on theories of, *inter alia*, strict liability, negligence, gross negligence, and failure to warn.

## B. *The Pertinent Statutes of Limitations and Claim–Accrual Dates*

The present appeal focuses solely on questions relating to the statutes of limitations applicable to plaintiffs' claims. There has been no adjudication or concession on the issue of causation, and nothing in this opinion expresses any view of this Court on the merits of the causation issue.

The timeliness of the present actions, in which federal jurisdiction is premised on diversity of citizenship, is governed by New York law, *see, e.g., Guaranty Trust Co. v. York*, 326 U.S. 99, 109–110, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Personis v. Oiler*, 889 F.2d 424, 426 (2d Cir.1989), to the extent that state law is not preempted by federal law. As discussed below, New York law reflects a variety of possible dates on which a toxic tort claim may be found to have accrued, including (1) the date of the victim's first exposure to the toxic substance, (2) the date of discovery of the injury, which could be as late as the time of the victim's death, and (3) the date of discovery of the injury's cause.

New York's Estates, Powers & Trusts Law ("N.Y.E.P.T.L." or "EPTL") provides a two-year limitations period for wrongful death claims, *i.e.*, claims on behalf of a decedent's distributees (as defined in the EPTL) who suffered pecuniary loss because of the decedent's death. *See* N.Y.E.P.T.L. § 5–4.1 (McKinney 1999). Under that section, the limitations period begins on the date of the decedent's death.

Section 214(5) of New York's Civil Practice Law and Rules ("N.Y.C.P.L.R." or "CPLR"), and CPLR § 214–c, which became effective in July 1986 and modifies § 214(5), govern claims for personal injury or property damage, including claims for pre-death injuries to a decedent's person or property ("survival claims"), *see* N.Y.E.P.T.L. § 11–3.2(b) (McKinney

2001). Section 214–c provides generally for a three-year limitations period for claims of personal injury caused by hazardous substances, *see* N.Y.C.P.L.R. § 214–c (McKinney 1990); subsection (2) of that section provides that the limitations period begins on the earlier of the date on which the injury was discovered or the date when, with reasonable diligence, the injury should have been discovered (collectively the "discovery-of-injury" date), *see id.* § 214–c(2). Subsection (4) further provides that such a claim may be asserted within one year after the date of discovery of the injury's cause ("discovery-of-cause" date), so long as the discovery-of-cause date is within five years after the discovery-of-injury date. *See id.* § 214–c(4). Thus, § 214–c(4) "gives the plaintiff five years after the discovery (actual or constructive) of the injury to ascertain its cause. If he does not (or cannot) discover the etiology within five years, then he is barred by the statute of limitations." N.Y.C.P.L.R. § 214–c *Practice Commentaries,* C214–c:4, at 634 (McKinney 1990). Section 214–c(4) also provides that if the toxic tort claim is not asserted within three years after the discovery-of-injury date, the plaintiff is required to show that scientific or medical knowledge "sufficient to ascertain the cause of his injury had not been discovered, identified or determined" within that three-year period. N.Y.C.P.L.R. § 214–c(4).

Section 214(5) provides that, except as provided in § 214–c, claims of personal injury must be brought within three years of the date of injury. *See id.* § 214(5) (McKinney 1990). For purposes of toxic tort claims, the date of injury is interpreted as the date of first exposure to the hazardous substance. *See Blanco v. American Telephone & Telegraph Co.,* 90 N.Y.2d 757, 767, 666 N.Y.S.2d 536, 540, 689 N.E.2d 506 (1997); *Snyder v. Town Insulation, Inc.,* 81 N.Y.2d 429, 432–33, 599 N.Y.S.2d 515, 516–17, 615 N.E.2d 999 (1993).

Section 9658 of 42 U.S.C., enacted by Congress in 1986 as § 309 of CERCLA, provides a uniform standard for determining the accrual dates of claims of personal injury due to exposure to hazardous substances. As set out in greater detail in Part II.A. below, the section establishes a "federally required commencement date," 42 U.S.C. § 9658(a)(1) ("FRCD" or "Federal Commencement Date"), to start the running of the applicable state period of limitations governing such a claim. That date is defined as "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages . . . were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." *Id.* § 9658(b)(4)(A).

C. *Defendants' First Motion for Partial Summary Judgment, Seeking Dismissal of the Wrongful Death, Survival, and Loss–of–Consortium Claims, and Challenging the Constitutionality of § 9658*

Following discovery limited to statute-of-limitations issues, defendants moved, in two stages, for partial summary judgment dismissing most of plaintiffs' claims on the ground that they were time-barred. In the first stage, in June 1997 (*see* Part I.E. below with respect to the second stage), defendants sought dismissal of the survival, wrongful death, and loss-of-consortium claims.

Defendants contended that the survival claims were barred by either CPLR § 214(5) or CPLR § 214–c. They argued essentially that some claims accrued prior to July 1986, *i.e.*, prior to the effective date of § 214–c, and hence were governed by CPLR § 214(5)'s three-year limitations pe-

riod. Defendants contended that those claims were time-barred because the injured persons were first exposed to the hazardous wastes no later than 1968, and these suits were commenced no earlier than 1995.

Defendants contended that virtually all of the remaining survival claims were barred by CPLR § 214–c(2)'s provision for a three-year limitations period, running from the earlier of the date on which the injury was discovered or the date when, with reasonable diligence, the injury should have been discovered. Noting that the latest possible discovery-of-injury date was either the date of diagnosis of the cancerous condition or the date of the decedent's death, defendants argued that at most one claim was filed within three years after the discovery-of-injury date.

As to the claims for wrongful death, defendants contended they were barred by N.Y.E.P.T.L. § 5–4.1 because these actions were commenced more than two years after the deaths of plaintiffs' decedents. Defendants also contended that the claims of loss of consortium, being derivative of the survival and wrongful death claims, could not be maintained if the underlying claims were dismissed.

In opposing this first summary judgment motion, plaintiffs did not dispute that their survival and wrongful death claims were based on injuries to or the deaths of persons who died between 1963 and 1993. However, they contended that, in accordance with the Federal Commencement Date set out in 42 U.S.C. § 9658, their claims accrued no earlier than the date on which they knew or reasonably should have known the cause of the injuries, arguing that the FRCD preempts state law with respect to the dates on which their claims accrued if state law would use an earlier date. Plaintiffs asserted that they should not reasonably have known the

cause of their own or their decedents' injuries earlier than December 19, 1994, when they learned the preliminary findings of a "Pfohl Environmental Health Study" by David A. Rigle, M.D., and William R. Sawyer, Ph.D. ("the Rigle–Sawyer Report"), prepared at the request of their attorneys. Those preliminary findings stated that persons frequenting the vicinity of the Landfill had an increased risk of developing cancers, including cancers of the types suffered by plaintiffs and their decedents, because of the toxic wastes stored at the Landfill. Plaintiffs also argued that the determination of the dates on which they reasonably should have known the cause of the injuries was not an appropriate matter for summary judgment.

Because pretrial discovery had not yet been completed, defendants did not, in their first summary judgment motion, argue for a reasonable discovery-of-cause date earlier than December 1994, but they argued that the Federal Commencement Date was either inapplicable or unconstitutional. They contended that it was inapplicable because, in focusing on "any action brought under State law for personal injury[ ] or property damages," 42 U.S.C. § 9658(a)(1), the FRCD was not meant to apply to a claim based on the death of a person other than the plaintiff. They argued that the FRCD was unconstitutional because the attempt to preempt state law as to the time of accrual of a state cause of action for purposes of a state statute of limitations exceeded Congress's powers under the Commerce Clause and was an intrusion on state sovereignty in violation of the Tenth Amendment.

D. *The District Court's Rejection of the Statutory Interpretation and Constitutional Challenges, and Its Partial Denial of Summary Judgment*

In an order dated October 27, 1998, the district court adopted the recommenda-

tions of Magistrate Judge Leslie G. Foschio, to whom the matter had been referred, *see Pfohl I,* 26 F.Supp.2d at 516–50 (reprinting and adopting Magistrate Judge's Report and Recommendation dated March 11, 1998), and granted defendants' motion in part and denied it in part. The court noted that, if federal law were not applicable, all of plaintiffs' wrongful death claims and virtually all of their survival claims would be time-barred. The wrongful death claims would be barred by N.Y.E.P.T.L. § 5–4.1 because plaintiffs' respective decedents died more than two years prior to the commencement of these actions. The survival claims would be barred either (a) by CPLR § 214(5) because they were not asserted within three years after the dates of first exposure to the Landfill's allegedly toxic substances, which "occurred between the early 1900's . . . and the late 1960's," *Pfohl I,* 26 F.Supp.2d at 520, or (b) by CPLR § 214–c because the discoveries of the injuries occurred between 1961 and 1993, and the claims were not asserted within three years after those discoveries or within one year after discovery of the cause of the injuries, *see Pfohl I,* 26 F.Supp.2d at 521.

The district court ruled, however, that § 9658, which the court concluded was intended to apply to survival and wrongful death claims as well as to other types of personal injury claims, provides a toxic-tort-claim accrual date that preempts state law to the extent that state law would otherwise set an earlier accrual date. The court thus concluded that New York's use of the date of death as the accrual date for a wrongful death cause of action was superseded by the Federal Commencement Date, as was the maximum five-year period allowed, on other types of toxic tort claims, for discovery of the cause following the discovery of the injury.

The court also rejected defendants' challenges to the constitutionality of the Federal Commencement Date. It found no violation of the Commerce Clause, reasoning that CERCLA regulates interstate commerce and that § 9658 is an integral part of the CERCLA regulatory scheme:

> To exclude congressional regulation of accrual rules even if limited to toxic torts arising from wholly intrastate releases of hazardous wastes would frustrate Congress['s] purpose to provide greater access to the courts for injured parties as part of its comprehensive response to the national problem of controlling and remediating the effects of release of dangerous contaminants. Lack of uniformity in achieving redress in state courts for toxic torts would also lead to potential competitive imbalances in the hazardous wastes disposal industry based on differing schemes for invoking relevant statutes of repose. Therefore, the FRCD is an essential part of a national regulatory system established by CERCLA and represents a valid exercise of congressional power.

26 F.Supp.2d at 543; *see also id.* ("The deterrent effect of [the FRCD] accrual formula, if it had existed earlier, upon would-be polluters could have helped to prevent the well documented assaults on the nation's natural environment by toxic substance producing industries and others."). The court also concluded that § 9658 does not violate the Tenth Amendment, reasoning principally that the FRCD does not regulate the content of state law but rather regulates access to the courts. *See id.* at 545.

Nonetheless, the district court ruled that some of plaintiffs' claims were time-barred even given the application of the FRCD. It interpreted § 9658 as superseding a more restrictive state law only with respect to the date on which a claim accrues, not with

respect to the length of the limitations period. The court concluded that, given plaintiffs' failure to assert the survival claims within three years of the discovery-of-injury date, those claims, to be timely, should have been asserted within one year after plaintiffs discovered the cause of the injuries. In light of plaintiffs' admission that they had discovered that cause as early as December 19, 1994, the court ruled that survival claims that were filed later than December 19, 1995, were time-barred. The court granted summary judgment dismissing those claims. As the court could not, at the time of *Pfohl I,* determine whether a date earlier than December 19, 1994, might be the appropriate discovery-of-cause date, it denied defendants' motion to dismiss any survival claims asserted prior to December 19, 1995.

The court also denied defendants' motion to dismiss the wrongful death claims because, assuming that plaintiffs discovered the cause of their respective decedents' injuries in December 1994, all of those claims (except those asserted in January 1997, which were not encompassed by the summary judgment motion because pretrial discovery proceedings had not been completed) had been filed within two years of the discovery-of-cause date and hence were timely. Finally, the court noted that it was possible that plaintiffs might have timely claims for loss of consortium appurtenant to timely survival claims, and it thus denied the motion to dismiss the loss-of-consortium claims as well.

E. *Defendants' Second Motion for Partial Summary Judgment, Seeking Dismissal of Plaintiffs' Own Personal Injury Claims*

In November 1997, during the pendency of their first motion for partial summary judgment dismissing the survival, wrong-ful death, and loss-of-consortium claims, defendants filed a second motion for partial summary judgment, this one seeking dismissal of claims for personal injuries suffered by the plaintiffs themselves. Defendants argued that, even assuming the Federal Commencement Date applied, those claims, first asserted in 1995, were barred by the one-year statute of limitations because they had accrued no later than the end of 1991 when, defendants contended, there existed sufficient publicly available information to put a reasonable person on notice to investigate whether there was a causal connection between his or her illness and the Landfill.

1. *Defendants' Evidence of Publicity and Warnings*

In support of their contention that by the end of 1991 plaintiffs should have known that their cancers were caused by the Landfill, defendants stated, *inter alia,* that beginning in 1986, large bright yellow signs warning **"DANGER HAZARDOUS WASTE AREA UNAUTHORIZED PERSONNEL KEEP OUT"** were posted around the perimeter of the Landfill. Defendants submitted copies of official communications of caution, numerous newspaper articles reporting on studies by the New York State ("State") Departments of Health ("DOH") and Environmental Conservation ("DEC"), and many expressions of public concern with respect to the possibility that the Pfohl Landfill contained hazardous wastes. Defendants' exhibits included the following:

▶ An April 15, 1986 letter to DOH from a Cheektowaga Town Councilman requesting an assessment of the Pfohl Landfill and another site, stating that he had "observed flows into ditches and drainage channels leading to Ellicott Creek as well as along public highways.... Both locations are of great

concern to the Town Board and are a matter of growing public interest."

‣ A May 31, 1986 article in *The Buffalo News* reporting that the Pfohl Landfill was "among 194 considered by the state to pose the most serious threat to the public and safety."

‣ A December 10, 1986 Memorandum of DEC stating that

[a]lthough there is a public health concern, there is no known immediate health danger associated with this site at this time. The warning signs erected address our concerns with public access to the site and to decrease the possibility of public exposure. Nearby property owners are advised to keep children away from site.

‣ An October 11, 1988 DEC letter to "Concerned Citizen[s]," noting that "preliminary investigations" revealed that

the existence of low level radiation has been identified in several areas of the landfill. After consultation with the New York State Department of Health ..., it has been determined that the site in its present state with the levels of radiation currently encountered does not present any immediate threat to public health.

‣ An October 14, 1988 article in *The Buffalo News* describing the above DEC letter and stating that

[e]vidence of low-level radiation has led state environmental engineers to caution persons not to enter the Pfohl Brothers landfill, a 120–acre former garbage and industrial waste dump in the northwest corner of Cheektowaga. The article quoted a DEC engineer as stating:

"We have been assured by the state Health Department that the radiation levels pose no threat to the pub-

lic, . . . . But as an added safety precaution, we are sending letters to area residents and businesses asking them to avoid the site."

‣ A November 2, 1989 article in *The Buffalo News* stating that a state expert reported " 'very, very minimal risk' " but that DEC officials cautioned people to avoid the area where warnings had been posted.

‣ An April 22, 1990 article in the suburban Buffalo *Metro Community News* reporting that "[o]ne of the area's top biologists" had criticized the methodology of DEC's studies.

‣ An August 1990 announcement by DOH of a public meeting in Cheektowaga to discuss the health assessments relating to the Landfill and the studies being conducted by DOH; the announcement also stated that DOH official Dr. James Melius would be available for individual consultations "to discuss [the resident's] health concerns as they relate to the Pfohl Brothers Landfill."

‣ An October 24, 1990 article in *The Buffalo News* reporting that tests showed lead levels at a site adjacent to the Landfill to be in excess of state standards.

Defendants noted that a number of concerned citizens of Cheektowaga and neighboring towns had formed committees to gather information about the Pfohl Landfill. In April 1990, one such group, the Pfohl Brothers Landfill Citizen Action Group (later renamed the Pfohl Brothers Landfill Cleanup Committee ("Cleanup Committee")), announced a public meeting to be held on April 24, 1990, to question the level of danger from chemical contamination at the Pfohl Landfill. The announcement stated that "Luella Kenny, former Love Canal resident, will discuss her experiences at Love Canal in the con-

text of our concerns about action on the Pfohl Brothers Landfill."

Defendants also submitted a March 1991 report of the Cancer Surveillance Program of DOH's Bureau of Cancer Epidemiology, entitled "Cancer Incidence in the Cheektowaga/ Ellicott Creek Area, Erie County, New York" for the period 1978–1987 ("1991 DOH Report on 1978–1987 Cancer Incidence"). The study, undertaken in response to "community concerns about cancer patterns in the Cheektowaga/Ellicott Creek area" (1991 DOH Report on 1978–1987 Cancer Incidence at 1), focused on three census tracts, Nos. 89.00, 96.00, and 100.01. This report stated that "[t]he number of observed cancer cases among females was significantly greater than the number expected" (*id.* at 2), and that "only one of the three census tracts which comprised the study area exhibited a significant excess of breast cancer cases (census tract 100.01)" (*id.* at 6). Although not specified in the report, census tract No. 100.01 included the Pfohl Landfill.

In sum, defendants argued that before the end of 1991, the Pfohl Landfill had been the subject of more than 100 newspaper articles, dozens of public meetings, and numerous government reports and letters. Defendants contended that no reasonable person who lived or worked near the Landfill could still have been unaware of the health hazards posed by the Landfill and that the public displays and reports of health concerns were sufficient to put a reasonable person on notice as to the need to investigate such concerns.

2. *Plaintiffs' Evidence of Official Reassurances*

In opposition to this summary judgment motion, plaintiffs reiterated that the earliest they could reasonably have known that the Pfohl Landfill caused their cancers was December 1994, when they received the preliminary findings of the Rigle–Sawyer Report stating that persons frequenting that vicinity had an increased risk of developing cancers, including cancers of the types suffered by plaintiffs and their decedents, because of the toxic wastes stored at the Landfill. Plaintiffs argued that although local citizens had theretofore questioned various governmental entities as to whether the Landfill wastes were carcinogenic, they had invariably received assurances that the area was safe. As summarized by plaintiffs' attorney,

> prior to December of 1994, not a single expert advised residents, workers, or others that the Pfohl Brothers Landfill had caused a higher incidence of cancer in the area surrounding the landfill. To the contrary, the experts that the plaintiffs/residents counted on for answers to their health questions—the New York State Department of Health—affirmatively stated that the landfill was not responsible for any health problems in the area.

(Affidavit of Laura J. Van Pelt dated December 19, 1997 ("Van Pelt Aff."), ¶ 3, at 3.)

In support of these assertions, plaintiffs submitted, *inter alia,* the affidavit of former DOH official Dr. James M. Melius, M.D., who had been the Director of DOH's Division of Occupational Health and Environmental Epidemiology from 1988 to 1995 and had supervised the preparation of several DOH studies relating to the Pfohl Landfill. These included a 1991 health survey of residents and workers in the area surrounding the Landfill, a 1991 testing of the levels of lead in the blood of 20 children living in the area surrounding the Landfill, and the 1991 DOH Report on 1978–1987 Cancer Incidence (which, as noted in Part I.E.1. above, was relied on by defendants in support of their motion for summary judgment).

Dr. Melius stated that "the health survey did not reveal any unusual patterns of reported illnesses among residents or workers." (Affidavit of Dr. James M. Melius dated December 17, 1997 ("Melius Aff."), ¶ 4.) And at a March 1991 public meeting, Dr. Melius "told the residents that the DOH's health survey did not reveal any general pattern of illness that could be related to exposure to chemicals from the Pfohl Brothers Landfill." (*Id.* ¶ 8.)

As to the 1991 blood-lead-level study, Dr. Melius stated that it had revealed that the lead levels in the children's blood were very low, and DOH had concluded (a) that there was no way to determine whether such lead as was present resulted from exposure to the Landfill, and (b) that in any event, the sources of the lead were immaterial because the levels were so low as to give no cause for concern. (*Id.* ¶ 2.) Dr. Melius also relayed this information to area residents at public meetings and in writing, making an "effort to communicate to residents that there was no cause for concern with respect to the issue of children being exposed to lead from the Pfohl Brothers Landfill." (*Id.* ¶ 3.)

As to the 1991 DOH Report on 1978–1987 Cancer Incidence, Dr. Melius stated that "[t]he number of observed cancer cases among females was significantly greater than expected; however, much of the overall excess among females was attributable to the significant excess of breast cancers and a non-significant excess of lung cancers." (*Id.* ¶ 5). Dr. Melius stated that he discussed these results with area residents at a public meeting held in March 1991 immediately after publication of the study results; that he told them that "the observed excess of breast cancer cases may be due to income, socioeconomic factors, increased cancer screening activities, and personal lifestyle and medical

history factors" (*id.* ¶ 7); and that neither he nor any other DOH employee "in any way" linked the excessive number of breast cancers to the Landfill:

> *I never told any member of the public,* at this meeting or otherwise, that the significant excess of breast and prostate cancer cases *was in any way related to the Pfohl Brothers landfill. To the best of my knowledge, no employee of the New York State Department of Health ever told any member of the public, at this meeting or otherwise, that the significant excess of breast and prostate cancer cases was in any way related to the Pfohl Brothers landfill.*
>
> 7. At the March 1991 public meeting discussed in paragraph 6 above, *I . . . told the residents that there is almost no information available that indicates that breast cancer may be related to exposure to chemicals.*

(*Id.* ¶¶ 6–7 (emphases added).) Dr. Melius assured the residents that DOH would follow up on the cancer-incidence study to investigate the possible causes of the high incidence of prostate and breast cancers.

The promised reports on follow-up studies of cancer incidence were issued by DOH in November 1991, and none of them revealed any linkage with the Pfohl Landfill. Dr. Melius stated that "[t]he follow-up study [on breast cancer] did not find a connection between breast cancer and the Pfohl Brothers Landfill because most of the women who had breast cancer had little reported potential exposure to contamination from the landfill." (Melius Aff. ¶ 9.) The follow-up study of prostate cancer likewise "did not find a .connection between prostate cancer and the Pfohl Brothers Landfill because no prostate cancer cases were located east of the Greater Buffalo International Airport, which is where the landfill is located." (*Id.* ¶ 10.) In addition,

DOH never found a statistically significant difference from the expected number of newly diagnosed cases for leukemia, lymphoma and female lung cancer. However, we examined the geographical distribution of these cancers because we were requested to do so.... *We did not find a connection between leukemia, lymphoma or female lung cancer and the Pfohl Brothers Landfill because we did not find a clustering of any of these cancers around the landfill.*

(*Id.* ¶ 11 (emphasis added).)

Dr. Melius communicated these follow-up results to the public, both orally and in writing "[a]s soon as they were available." (*Id.* ¶ 12.) He also noted that

[a]t several public meetings that I attended in the early 1990's (both before and after the DOH health survey and cancer incidence results were announced), residents requested that homes near the Pfohl Brothers Landfill be bought by the State of New York. At each of these meetings, representatives of the New York State Departments of Health and Environmental Conservation (including myself) explained to the public that *the State could not relocate residents unless there was documented evidence of a health threat, and that no such documented evidence existed.*

(*Id.* ¶ 13 (emphasis added).) Summarizing DOH's communications with the public as to the results of its many studies, Dr. Melius stated that

[w]hile I was the Director of the Division of Occupational Health and Environmental Epidemiology of the New York State Department of Health, I never told the public or any member thereof, at a meeting or otherwise, that any individual person's cancer, any particular type of cancer, any increased incidence of any particular type of cancer,

or cancer in general was related in any way to the Pfohl Brothers Landfill. To the best of my knowledge, while I was the Director of the Division of Occupational Health and Environmental Epidemiology of the New York State Department of Health, no employee of the Department of Health ever told the public or any member thereof, at a meeting or otherwise, that any individual person's cancer, any particular type of cancer, any increased incidence of any particular type of cancer, or cancer in general was related in any way to the Pfohl Brothers Landfill.

(*Id.* ¶ 15.)

Along with Dr. Melius's affidavit, plaintiffs submitted the reports and studies to which that affidavit referred. The Van Pelt affidavit also attached several other governmental reports, excerpts from more than a dozen depositions, and scores of news articles, including the following:

◀ An October 26, 1989 article in the *Cheektowaga Bee* bearing the headline **"Radiation at Pfohl site not over limits"** and reporting that, although DOH warned that people should not pick up or take any objects from the site, DEC concluded, based on supplemental testing of the radiation level at the Landfill, that " 'the site does not represent an immediate radiological health hazard.' "

◀ A November 2, 1989 article in *The Buffalo News* (also attached to defendants' summary judgment motion) reporting that two studies concluded that the radiation risks to the area were minimal, and that elevated radiation readings were not being detected off the Pfohl Landfill site.

◀ A March 30, 1990 article in *The Buffalo News* (also attached to defendants' summary judgment motion) bearing the headline **"State calls Pfohl dump no big risk"** and reporting that a DEC

report to be made available that day stated that the Landfill contains radioactive hot spots, but that the levels are within safe limits, and that " 'exposure to radiation on the site presents little, if any, public health hazard.' " The article stated that

> DEC minimized the exposure threat saying:
>
> —Most of the materials are buried and exposure to radiation is therefore reduced due to the distance and shielding provided by the soil.
>
> —Transport of surface radioactive material off the site by wind is unlikely because the site has heavy vegetation and is wet in many areas.
>
> —Radioactivity found in samples of ground water, sediment and seepage is at normal background levels showing that radioactive materials are not migrating off the site.
>
> The department did warn, however, that "direct contact with radioactive materials should be discouraged" and re-emphasized its warning that people should stay off the property. It has both fenced and posted signs warning of hazardous materials.

◆ A November 15, 1990 article in *The Buffalo News* (also attached to defendants' summary judgment motion) bearing the headline "**No health threat found in Pfohl Road soil tests**" and stating that, according to DOH,

> [s]cientists found no significant health threat from chemicals discovered in soil samples around homes south of the Pfohl Brothers dump....
>
> . . . .
>
> Among the state's conclusions from the site in Cheektowaga are:
>
> —There are no detectable levels of PCBs in the soil at the dump or off the site.

> —Levels of dioxin and furans are only a fraction of the level necessary to require federal remedial action.
>
> —Levels of heavy metal are "within the expected range for suburban areas."

◆ A March 26, 1991 article in *The Buffalo News* (also attached to defendants' summary judgment motion) with the headline "**Study finds higher cancer rate near Pfohl site**," describing the 1991 DOH Report on 1978–1987 Cancer Incidence, including findings that "[p]eople living near the Pfohl Brothers dump in Cheektowaga have exhibited higher than expected rates of breast and prostate cancer," and that there were "higher than expected instances of lymphoma and leukemias, but not high enough to be classified as a 'significant excess' statistically." The article cited Dr. Melius as stating that "preliminary conclusions show ... the increase [in the incidence of breast and prostate cancer] is likely related to income, socioeconomic and status factors"; that, based on the current, incomplete, information, " '[i]t's unlikely it's related to chemical exposures' "; and that " '[w]e can't tell whether the landfill is responsible.' "

◆ A December 17, 1991 article in *The Buffalo News* with the headline "**Study can't link Pfohl landfill to cancer**," reporting that state health officials' follow-up study of the higher-than-expected rates of cancers in the same census tract as the Landfill "failed to uncover any evidence of 'clustering' of prostate cancer, leukemia, lymphoma and female lung cancer near the inactive dump."

◆ A December 26, 1991 article in the *Cheektowaga Times* with the headline "**Health Department studies fail to link landfill to cancer**," reporting that "[a]ccording to recent reports released by the New York State Department of

Health, no link exists between the Pfohl Brothers Landfill site and cancer incidence for those residen[ts] living on or near the dump site."

◆ A December 2, 1993 article in the *Cheektowaga Times* headlined "**Ground water uncontaminated near Pfohl dump**" and stating that "[g]round water surrounding the Pfohl Brothers dump has turned up clean in all studies performed so far."

◆ An August 1994 DOH report entitled, "Summary of Cancer Inquiry for 1020 Rein Road, Cheektowaga," accompanied by a letter to residents of Cheektowaga stating that "none of the patterns of a true cancer cluster were found. . . . No evidence was found for a common environmental cause."

◆ An August 1994 assessment by the United States Department of Health and Human Services's Agency for Toxic Substances and Disease Registry ("USATSDR") of the Pfohl Landfill that "the proposed Pfohl Brothers Landfill National Priorities List Site represents *no apparent public health hazard* at the present time because available data do not indicate exposures to contaminants in the environmental media to be high enough to cause adverse health effects." (Emphasis in original.) The USATSDR report also stated that "[t]he results of NYSDOH's epidemiologic investigations, along with the lack of evidence of large scale exposure to site contaminants, indicates that the occurrence of cancer is probably not related to the site."

◆ An August 26, 1994 article in *The Buffalo News* stating: "Two studies by federal and state agencies refute charges that contamination from the Pfohl Brothers dump in Cheektowaga has caused serious health problems."

Plaintiffs also stated that although the Pfohl Landfill Cleanup Committee met with officials of DOH and DEC to seek information as to whether toxic materials were emanating from the Landfill, no more than one of the plaintiffs was a member of the group. (*See* Van Pelt Aff. ¶ 5, at 5 n.4.) Further, plaintiffs argued that, even had they been members of such groups, they would have had no reason to know that the Landfill contents were carcinogenic because those groups received assurances from the State agencies that the Landfill was safe. For example, Cleanup Committee President and Chairperson Elinor Weiss testified in her deposition that at one meeting, DOH and DEC representatives told those present that "the discovery of radioactivity at the [Landfill] was 'not that important' because [the officials] 'said that you could get more radiation from sleeping with your spouse than from standing on the Pfohl dump.'" (*Id.* ¶ 5, at 6 (quoting Deposition of Elinor Weiss at 24).)

### F. *The Granting of Summary Judgment*

In an order dated September 22, 1999, the district court accepted the recommendations of Magistrate Judge Foschio on the second summary judgment motion, *see Pfohl II*, 68 F.Supp.2d at 240–63 (reprinting and adopting Magistrate Judge's Report and Recommendation dated February 12, 1999), and granted, as to virtually all of plaintiffs' claims, defendants' motion to dismiss. The court found that plaintiffs had not "show[n] . . . that a material issue of fact exists as to the earliest time when they should have reasonably discovered the cause of their alleged injury making their claims timely under § 214–c(4) as modified by § 9658," *Pfohl II*, 68 F.Supp.2d at 251.

Noting that CPLR § 214–c(4) provides that if the action is not filed within three years of the date of discovery of the injury, the plaintiff is required to

"allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified[ ] or determined prior to the expiration of the period within which the action or claim would have been authorized,"

*Pfohl II,* 68 F.Supp.2d at 247 (quoting N.Y.C.P.L.R. § 214–c(4)), the court stated that plaintiffs were required to show that they filed their actions

within one year of the discovery of the causes of such injuries and ... that the state of medical, technological and scientific knowledge and information was insufficient such that it was not possible to discover the cause of their injuries within time to commence the instant actions within three years from the discovery of their cancers,

*Pfohl II,* 68 F.Supp.2d at 248.

As discussed in Part II.D. below, the court found that plaintiffs could and should have developed a "reasonable suspicion" that their cancers were caused by the Landfill by the end of 1991. *Id.* at 253. It found that the "plethora of exhibits" submitted by defendants,

consisting of government and media reports as well as other publicly available information pertaining to at least three citizen groups concerned with the effect of the Landfill on neighboring areas and residents, indicating that Plaintiffs should have developed a reasonable suspicion as to the cause of their injuries prior to the end of 1991. These exhibits establish that a highly publicized controversy existed within the local community over whether the Landfill posed a threat to the health and safety of those who resided or worked in the vicinity of the Landfill.

*Id.* (footnote omitted). Based on these exhibits, the court reiterated its view that the plaintiffs could reasonably have suspected the cause of their cancers by the end of 1991, stating that it was

more than reasonable that, given the volume of information available to the public prior to 1992, Plaintiffs could be expected to reasonably suspect the cause of their cancers before the end of 1991. The vast number of media and government reports Defendants submitted in support of summary judgment were all available prior to the end of 1991.

*Id.* at 254.

Noting plaintiffs' reliance on the Rigle–Sawyer Report's preliminary findings in December 1994 as their earliest reason to believe that the Landfill was the cause of their own and their decedents' injuries, the court found their reliance flawed because plaintiffs did not show that they could not have obtained such a report sooner:

*Plaintiffs have submitted no evidence or any explanation as required under § 214–c(4) why it was not possible to obtain a "scientific" opinion similar to the one contained in the Rigle–Sawyer Report on which they rely in support of their contention that the FRCD occurred no earlier than December 1994, substantially prior to that date.* The March and November 1991 DOH cancer incidence reports as well as the Rigle–Sawyer Report all compare the incidence of specific types of cancer diagnosed in persons who lived or worked near the Landfill with the expected incidence of similar types of cancer occurring within the general population. *It is undisputed that the conclusions reached by the DOH reports issued in March and November 1991 and the Rigle–Sawyer Report differ as to whether any elevation in the incidence of any particular type of cancers occurring among those who lived or worked near the*

*Landfill could be attributed to the hazardous and toxic substances known to have been deposited into the Landfill.* A review of the February 1991 report [a DOH February 8, 1991 report based on water samples collected in October 1990, which "concluded that the levels of hazardous and toxic substances detected in the residences was not sufficient to threaten human health," *Pfohl II,* 68 F.Supp.2d at 255] indicates that the DOH used different methods than Drs. Rigle and Sawyer to obtain specimens for the chemical analysis contained in those reports. *Plaintiffs do not, however, contend that the findings contained in the Rigle–Sawyer Report are based on scientific testing techniques or statistical analysis that could not have been performed earlier than 1994.* Nor do Plaintiffs deny [*sic* ] that the Rigle–Sawyer Report does anything other than draw correlations between the incidence of reported cancers in the vicinity of the Landfill and the type of hazardous and toxic substances detected in the Landfill. In any event, if the Rigle–Sawyer Report is based on technical, scientific or medical knowledge developed after the dates of the earlier DOH study, Plaintiffs have not, as required by Fed. R.Civ.P. 56(e), demonstrated it.

*Pfohl II,* 68 F.Supp.2d at 259 (emphases added).

On this basis, the court concluded that virtually all of plaintiffs' claims were time-barred. Judgment was entered on the dismissed claims pursuant to Fed.R.Civ.P. 54(b); the claims not found untimely were severed from the consolidated proceedings and are not at issue on this appeal.

## II. DISCUSSION

On appeal, plaintiffs do not challenge the district court's ruling that, if 42 U.S.C. § 9658 were inapplicable or unconstitutional, their claims would be time-barred under New York law. Rather, they contend principally that the court erred in ruling as a matter of law that they reasonably should have known the cause of the injuries before the end of 1991 and that the Federal Commencement Date was thus no later than the end of 1991. They also contend that the court erroneously ruled that they were invariably required to file suit within one year after the discovery-of-cause date, even if that period would end less than three years after the discovery-of-injury date. Various defendants and third-party-defendants have cross-appealed, seeking affirmance, in whole or in part, on the grounds (1) that the FRCD does not apply to wrongful death or survival claims, and (2) that, in purporting to alter state law as to the commencement date of a state limitations period for state-law claims, the FRCD (a) exceeds Congress's powers under the Commerce Clause, and (b) violates the Tenth Amendment.

For the reasons that follow, we conclude that the district court properly rejected defendants' statutory-interpretation and constitutional challenges to § 9658 and that it properly found that plaintiffs' claims were subject to the one-year limitations period following the discovery-of-cause date; but we conclude that there were triable issues of fact as to the time when plaintiffs reasonably should have known the cause of the injuries. As the resolution of defendants' challenges to the applicability and constitutionality of § 9658 is essential to the resolution of this appeal, and as plaintiffs concede that their claims would be time-barred under state law if the Federal Commencement Date were not applied, we address defendants' challenges first.

### A. *Defendants' Statutory Interpretation Challenges*

To the extent pertinent to these actions, the Superfund Amendments to CERCLA provide as follows:

§ 9658. **Actions under State law for damages from exposure to hazardous substances**

(a) **State statutes of limitations for hazardous substance cases**

(1) **Exception to State statutes**

In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

(2) **State law generally applicable**

Except as provided in paragraph (1), the statute of limitations established under State law shall apply in all actions brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility.

. . . .

(b) **Definitions.**

As used in this section—

(1) **Subchapter I terms**

The terms used in this section shall have the same meaning as when used in subchapter I of this chapter.

(2) **Applicable limitations period**

The term "applicable limitations period" means the period specified in a statute of limitations during which a civil action referred to in subsection (a)(1) of this section may be brought.

(3) **Commencement date**

The term "commencement date" means the date specified in a statute of limitations as the beginning of the applicable limitations period.

(4) **Federally required commencement date**

(A) **In general**

[With exceptions not relevant here,] the term "federally required commencement date" means the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned.

42 U.S.C. § 9658. Subchapter I of CERCLA defines "facility" to include any "landfill, storage container, [or] motor vehicle" and "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed." *Id.* § 9601(9). The term "release" includes leaking, emitting, discharging, escaping, leaching, dumping, and disposing of hazardous substances into the environment, *id.* § 9601(22); the term "environment" includes "ambient air" and "navigable waters" of the United States, *id.* § 9601(8).

██ The language of § 9658(a)(1), specifying that the applicable state limitations period "shall commence at the federally required commencement date in lieu of" an "earlier" date provided by state law, makes it indisputably clear that Congress intended, in the cases to which § 9658 applies, that the FRCD preempt state law accrual rules if, under those rules, accrual would occur earlier than the date on which the cause of the personal injury was, or reasonably should have been, known to be the hazardous substance. *Accord Union Pacific R.R. Co. v. Reilly Industries, Inc.,*

215 F.3d 830, 840 (8th Cir.2000). *Cf. ABB Industrial Systems, Inc. v. Prime Technology, Inc.,* 120 F.3d 351, 360 n. 5 (2d Cir.1997) ("Under 42 U.S.C. § 9658, if a claim is brought under state law for property damages caused by hazardous chemicals and state law does not provide a discovery rule, the state statute of limitations cannot begin to run until the plaintiff knew or should have known that the damages were caused by hazardous chemicals."); *Tucker v. Southern Wood Piedmont Co.,* 28 F.3d 1089, 1091 (11th Cir.1994) (same).

In arguing that the district court misinterpreted § 9658, defendants do not dispute that the section has preemptive effect on claims that are within its intended scope; but they contend (1) that survival claims are not within its scope because the word "plaintiff" in § 9658(b)(4)(A)'s phrase "the date the plaintiff knew (or reasonably should have known)" should be read to refer to the person who suffered the personal injury, rather than to the individual bringing the lawsuit, and (2) that wrongful death claims are not encompassed by § 9658 because they are not, under New York law, claims for "personal injury[ ] or property damages."

■ In construing a statutory provision, we look first to see whether it is clear or is instead ambiguous. *See, e.g., Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). We determine whether the provision is ambiguous by examining its language, the context in which the language is used, and the broader context of the statute as a whole. *See id.* at 341, 117 S.Ct. 843. If the provision is precise and unambiguous, we generally need look no further. *See, e.g., id.* at 340, 117 S.Ct. 843; *Connecticut National Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *Greenery Rehabilitation Group, Inc. v. Hammon,* 150 F.3d 226, 231 (2d Cir.1998) ("If

the statutory terms are unambiguous, our review generally ends and the statute is construed according to the plain meaning of its words."). If the statute is ambiguous, we look to legislative history as a means of determining congressional intent. *See, e.g., Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Auburn Housing Authority v. Martinez,* 277 F.3d 138, 143–44 (2d Cir.2002).

We conclude that these principles require rejection of defendants' contention that § 9658 does not encompass survival and wrongful death claims, for we find that its language unambiguously encompasses the former, and that, in light of the statutory scheme as a whole, it was meant to encompass the latter.

1. *Applicability of the FRCD to Survival Claims*

■ The scope of the FRCD is set in subsection (a)(1) of § 9658; by its terms, the section applies to *"any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance ... released into the environment from a facility."* 42 U.S.C. § 9658(a)(1) (emphasis added). Subsection (a)(1) does not use the term "plaintiff." Nor does it specify by whom such personal injury actions must have been brought or state any limitation as to the persons on whose behalf the actions may have been brought. The absence of any such limiting provisions suggests that the scope of the section is sufficiently broad to encompass not only a suit brought by the person injured, but as well a suit brought by a person who has the right to represent the person injured, such as his guardian or the executor of his estate. Absent any such qualifications of the phrase "any action brought," which on its face is all-encompassing, the implication of subsection (a)(1)

is that § 9658 is meant to apply to any personal injury or property damage claim asserted by any person on whom state law confers standing to assert it.

Nor do we see in the language of subsection (b)(4)(A), which does use the word "plaintiff" in defining the FRCD in terms of the "date the plaintiff knew (or reasonably should have known)" the cause of the injury, *id.* § 9658(b)(4)(A), any intimation whatever that the plaintiff must be the person who suffered the injury or that the person who suffered the injury must be the person who discovered its cause. Had Congress intended to limit the scope of the FRCD in this way, it could more simply have drafted this subsection to refer to 'the date the plaintiff knew (or reasonably should have known) that *his or her* personal injury . . . was caused or contributed to by the hazardous substance.' Instead, subsection (b)(4)(A) refers to knowledge of the plaintiff that the hazardous substance caused "the personal injury . . . *referred to in subsection (a)(1)*." *Id.* § 9658(b)(4)(A) (emphasis added). Given subsection (a)(1)'s broad scope, encompassing "any [personal injury] action brought," we think it plain that Congress meant the FRCD to have potential application whenever a claim for personal injury is brought by any person who, under state law, has standing to bring such a claim.

Defendants' contention that this interpretation is impermissible because it allows for an open-ended limitations period, hinging on the fortuity of when the cause of injury is discovered, is wide of the mark. The Federal Commencement Date is not wholly subjective, for it is defined not only as the time at which the plaintiff has actual knowledge of the cause, but also as the time at which the plaintiff reasonably should have had that knowledge. The latter sets an objective standard, and if the two dates differ, § 9658(b)(4)(A) implicitly makes the FRCD the earlier.

Defendants also argue that reading the term "plaintiff" to mean the person who brings the suit will facilitate "abuse" by allowing a decedent's heirs to have the suit instituted by one "who only recently learned the cause" of the decedent's injuries, in order to make the suit timely despite the fact that "a myriad of others (including the decedent) may have discovered it much earlier." (Defendants–Third–Party–Defendants–Appellees–Cross–Appellants' brief on appeal at 88–89.) This contention is likewise unpersuasive, as § 9658(b)(4)(A)'s objective standard for accrual will apply if there was sufficient information that a plaintiff reasonably should have known the cause of the injury earlier than he actually knew. In any event, defendants' speculative policy concerns cannot override the clear provisions of the statute.

In sum, we conclude that the district court did not err in ruling that survival claims are within the scope of § 9658.

### 2. *Applicability of the FRCD to Wrongful Death Claims*

■ Defendants' contention that the FRCD does not apply to wrongful death claims presents a somewhat closer question on the surface but is ultimately unpersuasive. Defendants argue that, although New York law characterizes survival claims as personal injury claims, it does not so characterize wrongful death claims, and hence the latter are not actions "brought under State law for personal injury[] or property damages" within the meaning of § 9658(a)(1). Given the possible variations among the laws of the several states, that phrase is not entirely free of ambiguity; but in light of Congress's intent in creating the Federal Commencement Date, we conclude that wrongful

death claims under New York law were meant to be encompassed by § 9658.

As discussed in Part II.B. below, the FRCD was introduced as one of the 1986 Superfund Amendments to CERCLA. Section 301(e) of CERCLA, as originally enacted in 1980, required Congress to obtain a study of "the adequacy of existing common law and statutory remedies in providing legal redress for *harm to man* and the environment caused by the release of hazardous substances into the environment." 42 U.S.C. § 9651(e)(1) (emphasis added). After reviewing the commissioned study, congressional committees noted that the report, prepared "by a distinguished panel of lawyers," concluded that because of the accrual dates selected by state law, "certain State statutes deprive plaintiffs of their day in court." H.R. Conf. Rep. No. 99–962 (1986) ("FRCD Conf. Rep."), at 261, *reprinted in* 1986 U.S.C.C.A.N. 3276, 3354; Report of the House of Representatives Committee on Energy and Commerce, H.R.Rep. No. 99–253(I) (1985) ("FRCD House Rep."), at 105, *reprinted in* 1986 U.S.C.C.A.N. 2835, 2887. The congressional committees recognized that "[i]n the case of a long-latency disease, such as cancer, a party may be barred from bringing his lawsuit if the statute of limitations begins to run at the time of the first injury—rather than from the time when the party 'discovers' that his injury was caused by the hazardous substance or pollutant or contaminant concerned." FRCD Conf. Rep. at 261, *reprinted in* 1986 U.S.C.C.A.N. at 3354; *see also* FRCD House Rep. at 105, *reprinted in* 1986 U.S.C.C.A.N. at 2887. As a result, the FRCD was introduced to "address[ ] the problem identified in the 301(e) study," by "provid[ing] for a Federal commencement date for State statutes of limitations which are applicable to *harm which results from exposure to a hazardous substance,*" defining that commencement date as "the date the plaintiff knew, or reasonably should have known, that the *personal injury referred to above* was caused or contributed to by the hazardous substance or pollutant or contaminant concerned." FRCD Conf. Rep. at 261, *reprinted in* 1986 U.S.C.C.A.N. at 3354 (emphases added). Thus, Congress's focus was on hazardous wastes' "harm to man," 42 U.S.C. § 9651(e)(1), and its intent was to make the FRCD applicable to claims for "harm which results from exposure to a hazardous substance," FRCD Conf. Rep. at 261, *reprinted in* 1986 U.S.C.C.A.N. at 3354.

■ Given this background, we see no valid basis for inferring that Congress meant § 9658 to distinguish between an action for wrongful death, as maintainable under New York law, and an action brought by a living victim. A living victim in a personal injury action may recover for, *inter alia,* damages for lost future earnings. *See, e.g., Lopez v. Kenmore–Tonawanda School District,* 275 A.D.2d 894, 895, 713 N.Y.S.2d 607, 609 (4th Dep't 2000) (mem.). Such a recovery would usually to some extent benefit the victim's dependents. If the victim has died, damages for his lost future earnings are recoverable only in a wrongful death action. *Compare Sand v. Chapin,* 238 A.D.2d 862, 863, 656 N.Y.S.2d 700, 701 (3d Dep't 1997) (mem.) (lost future earnings not recoverable in survival action), *and* N.Y.E.P.T.L. § 11–3.3 *Practice Commentaries* at 346 (McKinney 2001) (permissible recovery in survival action "includes only damages accruing until [the decedent's] death"), *with Parilis v. Feinstein,* 49 N.Y.2d 984, 985, 429 N.Y.S.2d 165, 166, 406 N.E.2d 1059 (1980) (mem.) (in a wrongful death action, recovery is permissible for "loss of support, voluntary assistance and possible inheritance"), *and* N.Y.E.P.T.L. §§ 5–4.3(c)(ii) and (iii) (factfinder in a wrongful death action must consider the amount of

income taxes the decedent would have been required to pay from the "sum that would otherwise be available for the support of persons for whom the action is brought").

Indisputably, the claim by a living victim for future earnings lost as a result of the injuries he suffered from exposure to hazardous wastes is one "for personal injury" within the meaning of § 9658(a)(1). Yet under defendants' proposed interpretation of the FRCD, wrongful death claims by the decedent's distributees for relief paralleling that which would have been available to the victim had he lived, including claims seeking their respective shares of the decedent's earnings lost as a result of that exposure, would not be within the scope of § 9658. Quite clearly then, under defendants' view of the FRCD, a company whose handling of hazardous wastes caused personal injury would be financially better off if its victim died. We conclude that this was not Congress's intent.

B. *Defendants' Commerce Clause Challenge*

■ The Commerce Clause of the Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. Although the power to enact laws under the Commerce Clause is subject to "judicially enforceable outer limits," *United States v. Lopez*, 514 U.S. 549, 566, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the "power is 'complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution,'" *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824)). "Due respect for the decisions of a coordinate branch of Govern-

ment demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

■ The Supreme Court "has made clear that the commerce power extends not only to 'the use of channels of interstate or foreign commerce' and to 'protection of the instrumentalities of interstate commerce ... or persons or things in commerce,' but also to 'activities affecting commerce.'" *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. at 276–77, 101 S.Ct. 2352 (quoting *Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)). In determining whether Congress has exceeded its authority under the Commerce Clause, we may look to, *inter alia*, whether the activity regulated is economic in nature, whether there are discernible ties to commerce, whether the type of activity as a whole has an effect on commerce, and what congressional findings have been made with respect to the activity's effects on commerce. *See, e.g., Lopez*, 514 U.S. at 559–63, 115 S.Ct. 1624; *see also Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 778 (2d Cir.), *cert. denied*, 528 U.S. 868, 120 S.Ct. 166, 145 L.Ed.2d 140 (1999). A federal statute will survive a Commerce Clause challenge if it regulates activities that arise out of or are connected with a commercial transaction when the transaction and the activities, viewed in the aggregate, substantially affect interstate commerce. *See, e.g., Wickard v. Filburn*, 317 U.S. 111, 127–29, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (rejecting Commerce Clause challenge to federal statute regulating production and consumption of homegrown wheat because wheat farming as a whole substantially affects interstate commerce); *see also Lopez*, 514 U.S. at 561,

115 S.Ct. 1624 (upholding Commerce Clause challenge to federal statute prohibiting possession of firearm in school zone, where prohibition was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated"). " '[E]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations.' " *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. at 277, 101 S.Ct. 2352 (quoting *Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975)).

 Further, when Congress has enacted a statute creating a program to regulate aspects of commercial transactions that, viewed in the aggregate, substantially affect interstate commerce, it is not necessary that each element of the regulatory scheme have a substantial connection with commerce when viewed in isolation. An individual provision will survive a Commerce Clause challenge if it is "an integral part of the regulatory program[,] and ... the regulatory scheme when considered as a whole" can be shown to be "independently and directly related to a valid congressional goal." *Hodel v. Indiana*, 452 U.S. 314, 329 n. 17, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981); *see also Federal Energy Regulatory Commission v. Mississippi*, 456 U.S. 742, 757 n. 22, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982).

 The FRCD is part of CERCLA, 42 U.S.C. §§ 9601–9675. The stated purpose of CERCLA, which defines the term "environment" to include "ambient air" and "navigable waters" of the United States, 42 U.S.C. § 9601(8), is "[t]o provide for liability, compensation, cleanup, and emergency response for hazardous sub-stances released into the environment and the cleanup of inactive hazardous waste disposal sites," Pub.L. No. 96–510, 94 Stat. 2767, 2767 (1980). *See also* Report of the House of Representatives Committee on Interstate and Foreign Commerce, H.R.Rep. No. 96–1016(I) (1980) ("CERCLA House Rep."), at 17, *reprinted in* 1980 U.S.C.C.A.N. 6119, 6119–20 (bill that became CERCLA was designed to give the United States Environmental Protection Agency ("EPA") authority to deal effectively with spills of hazardous substances as well as with "the tragic consequences of improperly, negligently, and recklessly hazardous waste disposal practices known as the inactive hazardous waste site problem" (internal quotation marks omitted)); *id.* at 18, *reprinted in* 1980 U.S.C.C.A.N. at 6120 ("In 1979 the EPA estimated that as many as 30,000 to 50,000 sites existed, of which between 1,200–2,000 present a serious risk to public health.").

In furtherance of its purposes, CERCLA permits the government to address environmental emergencies by removing hazardous substances immediately, *see* 42 U.S.C. § 9604(a); authorizes a national plan establishing procedures and standards for responding to releases of hazardous substances, *see id.* § 9605(a); authorizes the President to issue administrative orders, or to seek court orders, directing responsible entities to clean up hazardous waste sites, *see id.* § 9606(a); imposes liability for clean-up costs on entities responsible for the disposal of hazardous wastes, *see id.* § 9607(a) (permitting the government and private parties to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation); and imposes liability for damage to natural resources, *see id.* § 9607(f) (permitting the government to recover for such damage). These and other provisions are directed toward Congress's goals of,

*inter alia,* "provid[ing] for liability of persons responsible for releases of hazardous waste at such sites," CERCLA House Rep. at 1, *reprinted in* 1980 U.S.C.C.A.N. at 6119, and *"induc[ing] such persons voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites," id.* at 17, *reprinted in* 1980 U.S.C.C.A.N. at 6120 (emphasis added).

Accordingly, it is recognized that CERCLA is "principally designed to effectuate the cleanup of toxic waste sites [and] to compensate those who have attended to the remediation of environmental hazards," *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996), and that "the 'two ... main purposes of CERCLA' are 'prompt cleanup of hazardous waste sites and imposition of all cleanup costs on the responsible party,'" *id.* (quoting *General Electric Co. v. Litton Industrial Automation Systems, Inc.,* 920 F.2d 1415, 1422 (8th Cir.1990), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991)).

In passing CERCLA, Congress did not include legislative findings with respect to the statute's relationship to interstate commerce. However, it is clear that the generation and disposal of waste material by companies in connection with the manufacture or processing of products is a business activity, and that the storage of such wastes by others is economic activity. *See generally Fort Gratiot Sanitary Landfill, Inc. v. Michigan Department of Natural Resources,* 504 U.S. 353, 359, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992) ("Solid waste, even if it has no value, is an article of commerce."); *Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992); *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). And it is clear that such wastes are commonly transported in interstate commerce. *See generally Chemical Waste Management,* 504 U.S. at 337, 112 S.Ct. 2009 (in 1992, only 16 states had commercial hazardous waste landfills); *cf. New York v. United States,* 505 U.S. 144, 150, 159–60, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (because few states have disposal sites for low-level radioactive waste, and space in those sites is frequently sold by residents of one state to residents of another, "[r]egulation of the resulting interstate market in waste disposal is ... well within Congress' authority under the Commerce Clause"). Further, even wholly intrastate disposal of hazardous wastes can threaten interstate and foreign commerce, as those wastes can contaminate streams that run through landfills and feed into tributaries of navigable waters. Thus, "Congress has substantial power under the Constitution to encourage the States to provide for the disposal of the radioactive waste generated within their borders." *Id.* at 149, 112 S.Ct. 2408.

In considering legislation to promote safer containment of hazardous wastes and to decrease pollution of the ambient air and navigable waters by such materials, Congress plainly sought to deal with matters that substantially affected interstate commerce. As the Court of Appeals for the Eleventh Circuit observed in *USA v. Olin Corp.,* 107 F.3d 1506 (11th Cir.1997),

> [w]hen the Senate considered S. 1480, a bill containing cleanup liability provisions later substantially incorporated into CERCLA, its Committee on Environment and Public Works ("the Committee") took notice of many facts that show a nexus between all forms of improper waste disposal and interstate commerce. First, the Committee noted the growth of the chemical industry and the concomitant costs of handling its waste. *See* S.Rep. No. 96–848, 96th

Cong., 2d Sess. 2 (1980), *reprinted in* 1 *Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980,* at 309 (1983). . . . It also cited a 1980 report by the Office of Technology Assessment which gauged agricultural losses from chemical contamination in six states at $283 million. *Id.* at 310. *The Committee reported that the commercial damages resulting from unregulated waste management were not attributable solely to interstate trafficking in hazardous materials for disposal, but also arose from accidents associated with purely intrastate, on-site disposal activities, such as improper waste storage in tanks, lagoons and chemical plants. Id.* at 312. Thus, CERCLA reflects Congress's recognition that both on-site and off-site disposal of hazardous waste threaten interstate commerce.

107 F.3d at 1511 (footnotes omitted) (emphasis added). Clearly, CERCLA itself was enacted as a response to a national problem, was directly related to a valid congressional concern, and was within Congress's powers under the Commerce Clause. *See, e.g., id.*

Indeed, defendants do not contend that CERCLA exceeds Congress's powers under the Commerce Clause. Rather they argue that the FRCD alone is unconstitutional. (*See* Defendants–Third–Party–Defendants–Appellees–Cross–Appellants' brief on appeal at 74–75 n.23 ("the FRCD may be severed and the remainder of CERCLA may be left in force").) However, defendants' Commerce Clause challenge to the FRCD ignores the FRCD's function in furthering the goals of CERCLA.

As noted, one of CERCLA's goals was to "induce" companies generating, transporting, dumping, and storing, etc., hazardous wastes "voluntarily to pursue appropriate environmental response actions with respect to inactive hazardous waste sites," CERCLA House Rep. at 17, *reprinted in* 1980 U.S.C.C.A.N. at 6120. We think it plain that the FRCD provides such inducement. As discussed in Part II.A.2. above, the FRCD was adopted in response to findings, made in a study required by § 301(e) of CERCLA, that state-law dates of accrual of claims for injuries caused by exposure to hazardous substances—especially injuries having a long latency period, such as cancer—frequently resulted in such claims becoming time-barred even before the injured person knew the cause of his injury. In requiring that the courts apply instead, if later than the state-law date, an objective accrual date, to wit, the date when the plaintiff "reasonably should have known" the injury's cause, § 9658 gives companies responsible for hazardous wastes greater incentives to clean up the waste sites, for it exposes those companies to a longer period of liability for the harms those sites cause to human health and the environment. The longer the period of liability, the more likely it is that a responsible company will bear the expense of the harms it has caused. The greater the potential cost to the company, the greater the likelihood that the company will strive to avoid liability by taking appropriate remedial actions with respect to its hazardous waste sites. And the more remedial action that is undertaken voluntarily, the less the need for government intervention, and the cleaner the environment.

In sum, we conclude that the FRCD is an integral part of the regulatory scheme established by CERCLA, furthering CERCLA's goals in various ways, and that the enactment of the FRCD constituted a valid exercise of Congress's powers under the Commerce Clause.

C. *Defendants' Tenth Amendment Challenge*

██ Defendants also contend that the FRCD violates the Tenth Amendment, ar-

guing that it effectively alters certain state statutes of limitations, overruling important policy choices made by a state legislature that had evaluated and balanced the competing interests, and that the FRCD improperly coerces states to regulate state-law toxic tort claims according to a federal formula. Notwithstanding the skepticism expressed in *ABB Industrial Systems, Inc. v. Prime Technology, Inc.,* in which we stated that the FRCD was of "questionable constitutionality," 120 F.3d at 360 n. 5, while noting that the issue was not properly before us, *see id.,* we reject defendants' challenge.

■ The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Tenth Amendment limits Congress's regulatory power, preventing Congress from essentially "commandeering" a state's legislative or executive departments " 'by directly compelling them to enact and enforce a federal regulatory program.' " *New York v. United States,* 505 U.S. at 161, 112 S.Ct. 2408 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. at 288, 101 S.Ct. 2352); *see also Printz v. United States,* 521 U.S. 898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (Congress may "no[t] command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program").

The FRCD, however, does not conscript into federal service either the state's legislature or its executive branch. Rather, in order that persons victimized by exposure to hazardous wastes not be "deprive[d] ... of their day in court," FRCD Conf. Rep. at 261, *reprinted in* 1986 U.S.C.C.A.N. at 3354, and that the companies that substantive state law would hold responsible not

escape liability, the FRCD simply requires courts in which state-law toxic tort claims are asserted to recognize that such a claim did not accrue before the plaintiff knew or reasonably should have known the cause of the injury. This is a modest requirement that is squarely within Congress's long established powers under the Supremacy Clause of the Constitution.

■ The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; *and the Judges in every State shall be bound thereby,* any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2 (emphasis added). Accordingly, consistent with the Tenth Amendment, Congress may create federal causes of action that state courts are obligated to adjudicate. *See, e.g., Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). Or it may enact a federal law that preempts a state-law cause of action, thereby foreclosing state courts from entertaining such a state-law claim. *See generally English v. General Electric Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Or Congress may, as it has done on occasion, simply extend a state limitations period. *See, e.g., Stewart v. Kahn,* 78 U.S. (11 Wall.) 493, 20 L.Ed. 176 (1870) (upholding federal statute tolling limitations periods for actions against persons who could not be served with process because they were in Confederate territory); *see also* 50 U.S.C. app. § 525 (tolling limitations periods for actions by or against persons in active military service); 28 U.S.C. § 1367(d) (tolling state limitations period on state claim asserted in federal court based on supplemental jurisdiction, if federal court thereafter declines to exercise such jurisdiction); 15 U.S.C. § 6603(h) (extending limitations periods

for mortgage foreclosure actions where Y2K-related failures impeded processing of mortgage payments).

■ Simply put, the Tenth Amendment does not prevent the application of federal law in state courts even though "[f]ederal statutes enforceable in state courts do, in a sense, direct state judges to enforce them," because "this sort of federal 'direction' of state judges is mandated by the text of the Supremacy Clause." *New York v. United States*, 505 U.S. at 178–79, 112 S.Ct. 2408. The FRCD, which requires no action by a state's legislative or executive officials, but only the application of federal law by the courts to recognize the Federal Commencement Date of a state-law claim, does not violate the Tenth Amendment.

Having rejected all of defendants' statutory interpretation and constitutional challenges to the application of the FRCD, we turn to plaintiffs' challenges to the district court's dismissal of their claims.

### D. *Plaintiffs' Challenge to the Ruling That, As a Matter of Law, the FRCD Was Not Later Than the End of 1991*

As discussed in Part I.F. above, the district court granted summary judgment dismissing plaintiffs' claims as time-barred on the ground that there was no genuine issue of fact to be tried as to the date on which their claims accrued under the FRCD, ruling that, as a matter of law, that date was no later than the end of 1991. In so ruling, the court found principally that the government and media reports and public controversy over the health hazards posed by the Landfill sufficed to give plaintiffs "a reasonable suspicion" as to the cause of their cancers prior to the end of 1991, *Pfohl II*, 68 F.Supp.2d at 253, and that plaintiffs failed to show "why it was not possible to obtain a 'scientific' opinion similar to the one contained in the Rigle-

Sawyer Report" earlier than 1994, *id.* at 259. We have several difficulties with the legal standards applied by the district court and with its view of the factual record.

### 1. *The Legal Standards Applied by the District Court*

First, the district court erroneously imputed to the Federal Commencement Date a standard of "reasonable suspicion." *See, e.g., Pfohl II*, 68 F.Supp.2d at 253 (plaintiffs "should have developed a *reasonable suspicion* as to the cause of their injuries prior to the end of 1991" (emphasis added)); *id.* at 254 ("given the volume of information available to the public prior to 1992, Plaintiffs could be expected to *reasonably suspect* the cause of their cancers before the end of 1991" (emphasis added)); *id.* at 257 ("no reasonable trier of fact could find that Plaintiffs, had they been reasonably diligent in inquiring as to the cause of their cancers upon being diagnosed, would not have discovered sufficient information to develop a *reasonable suspicion* as to the cause of such injuries prior to the end of 1991" (emphasis added)). In so reasoning, the district court apparently accepted "Defendants['] conten[tion] that a *reasonable suspicion* that an injury may have been caused by exposure to toxic or hazardous substances *is sufficient to trigger a rule of limitations that is predicated on knowledge of a fact or event*," *id.* at 252 (emphases added). Insofar as the FRCD is concerned, this contention should have been rejected.

■ The discovery-of-cause standard set by the FRCD, defined as "the date the plaintiff knew (or reasonably should have known) that the personal injury" was caused or contributed to by the hazardous materials, focuses on knowledge, actual or imputed, not on suspicion. Mere suspicion, whatever its reasonableness, cannot be eq-

uated with knowledge; and the fact that a claimant had only a "reasonable suspicion" that the injuries were caused by the Landfill is not a sufficient basis for ruling as a matter of law that the claimant "reasonably should have *known*" (emphasis added) that the injuries were caused by the Landfill. Accordingly, the district court applied an erroneous legal standard in interpreting the FRCD.

Second, in addressing the showing that a plaintiff is required to make under New York's CPLR § 214–c(4) as to the state of scientific or medical knowledge as to the cause of injury, the court applied a standard of impossibility of such knowledge. *See, e.g., Pfohl II*, 68 F.Supp.2d at 248 (plaintiffs were required to show "that the state of medical, technological and scientific knowledge and information was insufficient such that *it was not possible* to discover the cause of their injuries within time to commence the instant actions within three years from the discovery of their cancers" (emphasis added)); *id.* at 257 ("Plaintiffs have failed to establish the existence of a material issue of fact that such cause *could* not have been determined prior to the end of 1991" (emphasis added)). As discussed below, it is not clear to us that this is a correct interpretation of the CPLR provision as a matter of state law; but it is clear that to the extent the CPLR provision would result in an earlier accrual date than that provided by the FRCD, the CPLR provision is preempted.

The district court's interpretation that a plaintiff must show that the cause of the injury "could not have been" determined within three years after the date of discovery of the injury does not match the language of the statute itself. That section states that if the action is not filed within that period the plaintiff is required to show that, prior to the expiration of that period, "technical, scientific or medi-

cal knowledge and information sufficient to ascertain the cause of his injury *had not been* discovered, identified or determined." N.Y.C.P.L.R. § 214–c(4) (emphasis added). (We note that, though the phrase "had not been" is straightforward enough, some joinders of subjects and predicates in this passage are somewhat awkward: For example, is "scientific knowledge" "discovered"? Is "scientific knowledge" "determined"—and if so, does the word "determined" connote a consensus? And does "scientific knowledge" mean, as the district court viewed it in *Pfohl II*, 68 F.Supp.2d at 259, " 'scientific' opinion"? *See also* N.Y.C.P.L.R. § 214–c *Practice Commentaries*, C214–c:4, at 635 (The statute "reeks of the midnight oil of political compromise.... [T]he draftsmanship cannot be described as commendable.").)

Despite the difference between the district court's phrase "could not have been" determined and the statute's phrase "had not been" determined, the district court's standard finds some explicit—but not unequivocal—support in the New York practice commentaries. For example, the official commentator states that "the plaintiff must demonstrate [a] that the state of medical or scientific knowledge was such that the causation of his injury *could not have been* identified within the three-year period" after the discovery of the injury, N.Y.C.P.L.R. § 214–c(4) *Practice Commentaries*, C214–c:4, at 634–35 (emphasis added), and "[b] that it was *impossible* to determine the cause of his injury within three years after the discovery of his injury," *id.* at 635 (emphasis added). To that extent, therefore, the official commentary supports the district court's view of New York law.

Nonetheless, the official commentary also, after noting the less-than-"commendable" legislative draftsmanship, states that

the New York Legislature "apparently intended ... [that] the test should be: Was the requisite scientific knowledge *reasonably available* to the plaintiff during the three-year discovery period?" N.Y.C.P.L.R. § 214–c *Practice Commentaries,* C214–c:4, at 635 (emphasis added). This seems to us the more reasonable interpretation of New York law, for the district court's construction would seem to place burdens on a would-be plaintiff that the Legislature could not have intended. For example, the district court stated that plaintiffs could not meet the cause-could-not-have-been-determined standard because, before the end of 1991, they could have commissioned experts to conduct environmental studies and prepare a report such as the Rigle–Sawyer report. However, " 'the *reasonable* cost of a site-specific study to determine whether there has been an excess number of cancer cases related to a multiple toxic agent environmental cause such as the Pfohl Brothers Landfill would be *at least two (2) million dollars.*' " (Van Pelt Aff. ¶ 41 (quoting ¶ 6 of the Affidavit of Dr. Rosalie Bertell, an expert in environmental epidemiology with more than 30 years of experience) (emphases in original).) We doubt that the New York Legislature meant to refer to scientific knowledge that would not have been available to a plaintiff without the expenditure of huge sums of money to commission independent studies. And we certainly cannot conclude that Congress meant the FRCD standard of what a plaintiff "reasonably should have known" to extend to information that was obtainable only through the private commissioning of expensive studies.

We think it likely that the official commentary's suggestion that the New York Legislature intended CPLR § 214–c(4) to refer only to scientific knowledge that was "reasonably available" to the plaintiff is the correct interpretation of that section.

And we think it possible that in intending to set a reasonable-availability-of-knowledge-of-cause standard, the New York Legislature meant to fix an accrual date no earlier than the date the plaintiff knew or reasonably should have known the cause of the injury—*i.e.,* the same accrual date as that set by the FRCD. To the extent, however, that the scientific-knowledge provision of CPLR § 214–c(4) imposes an accrual date earlier than the date on which the plaintiff knew or reasonably should have known the cause of the injury, it is, for the reasons discussed in Part II.A. above, preempted by the FRCD.

### 2. *The District Court's View of the Factual Record*

We also conclude that the district court did not correctly apply the principles applicable to the consideration of a motion for summary judgment. In assessing such a motion, the court is required to view the factual record in the light most favorable to the party against whom summary judgment is sought and to draw all factual inferences in favor of that party. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam). The district court, while adverting to this standard, did not apply it.

In ruling that the FRCD was no later than the end of 1991, the district court relied on the fact that "Defendants ha[d] submitted a plethora of exhibits," principally consisting of "government and media reports"; the court found that these documents "establish[ed] that a highly publicized controversy existed within the local community over whether the Landfill posed a threat to the health and safety of those who resided or worked in the vicinity of the Landfill"; and the court concluded

that these documents should have raised in plaintiffs a "reasonable suspicion as to the cause of their injuries." *Pfohl II*, 68 F.Supp.2d at 253. The court accepted defendants' argument that

> as after 1991 there were no new government studies, releases of previously undisclosed information, nor any medical or scientific breakthroughs on which Plaintiffs rely as having permitted them to discover the cause of their cancers, Plaintiffs have failed to establish the existence of a material issue of fact that such cause could not have been determined prior to the end of 1991.

*Id.* at 257. We have two difficulties with the court's reliance on the documents submitted by defendants.

First, many of defendants' documents themselves reflected the absence of any scientific knowledge that the Landfill was carcinogenic; and indeed, reports of expert studies suggested that it was not. For example, defendants submitted an October 11, 1988 DEC letter to "Concerned Citizen[s]," that stated, *inter alia*, that the low radiation levels found in areas of the Landfill "does not present any immediate threat to public health." And among the statements in news articles submitted by defendants were the following: "radiation levels" at the Pfohl Landfill, according to DEC and DOH, "pose no threat to the public" (*The Buffalo News*, October 14, 1988); radiation risks from the Pfohl Landfill, according to State expert, are " 'very, very minimal' " (*The Buffalo News*, November 2, 1989); " 'exposure to radiation on the site,' " according to DEC, " 'presents little, if any, public health hazard' " (*The Buffalo News*, March 30, 1990); and "[n]o health threat found in [DOH's] Pfohl Road soil tests" (*The Buffalo News*, November 15, 1990).

Even the most alarming DOH report, issued in March 1991 and reporting excess numbers of certain types of cancers in 1978–1987, was, accurately, described in news articles as being accompanied by State officials' denials of any clear linkages between the cancers and the Landfill. *See, e.g., The Buffalo News*, March 26, 1991 (DOH study finds "higher than expected instances of lymphoma and leukemias, but not high enough to be classified as a 'significant excess' statistically"; "the increase is likely related to income, socioeconomic and status factors"; DOH " 'can't tell whether the landfill is responsible' ").

Thus, the district court inappropriately failed to view the documents submitted by defendants in the light most favorable to plaintiffs as the parties against whom summary judgment was sought. While defendants provided abundant evidence of the existence of controversy, much of what they submitted was either equivocal as to whether the Landfill could be causing cancers or contained outright denials of such causation. No doubt the lack of any indication in these reports and articles that there was scientific knowledge that the Landfill was carcinogenic was an impetus for defendants' urging the district court that the reasonably-should-have "known" standard of § 9658 could be satisfied by showing a basis merely for reasonable "suspicion."

Our second difficulty with the district court's application of summary judgment principles is that, in reaching its conclusions as to the date on which plaintiffs "reasonably should have known" the cause of the injuries, the district court did not acknowledge the inferences available to plaintiffs from the record as a whole. Even had the documents submitted by defendants supported an inference of early constructive knowledge rather than simply of suspicion, the court was required to consider not just those documents but also

the evidence submitted by plaintiffs. The court's opinion does not indicate that it did so. For example, although noting that there were no new revelatory government studies "after 1991," *Pfohl II*, 68 F.Supp.2d at 257, the court apparently did not take into account the fact that the latest studies done in 1991 gave plaintiffs no reason whatever to know that the cancers were caused by the Landfill. As described in Part I.E.2. above, DOH's follow-up studies on cancer incidence, reported in November 1991, revealed no linkage with the Pfohl Landfill. The Melius affidavit described the results of those studies, the reasoning of DOH in reaching its conclusions, and the statements made by State officials to area residents that "no ... documented evidence existed" of a health threat posed by the Pfohl Landfill (Melius Aff. ¶ 13).

The publicity surrounding the November 1991 DOH reports surely gave plaintiffs no reason to know the cancers were caused by the Landfill. *The Buffalo News* on December 17, 1991, carried the headline **"Study can't link Pfohl landfill to cancer"** and reported that the DOH follow-up study of the higher-than-expected rates of cancers in the same census tract as the Landfill "failed to uncover any evidence of 'clustering' of prostate cancer, leukemia, lymphoma and female lung cancer near the inactive dump." Similarly, the *Cheektowaga Times* on December 26, 1991, carried the headline **"Health Department studies fail to link landfill to cancer"** and reported that "[a]ccording to recent reports released by the New York State Department of Health, no link exists between the Pfohl Brothers Landfill site and cancer incidence for those residen[ts] living on or near the dump site."

Subsequent articles, as well as state and federal governmental studies, continued after 1991 to report the lack of any discovery of a link between the cancers and the Landfill. *See, e.g., Cheektowaga Times*, December 2, 1993 ("Ground water uncontaminated near Pfohl dump"; "Ground water surrounding the Pfohl Brothers dump has turned up clean in all studies performed so far."); *The Buffalo News*, August 26, 1994 ("Two studies by federal and state agencies refute charges that contamination from the Pfohl Brothers dump in Cheektowaga has caused serious health problems."); August 1994 DOH report (with letter to residents of Cheektowaga stating that "none of the patterns of a true cancer cluster were found.... No evidence was found for a common environmental cause."); August 1994 USATSDR report ("available data [on the Pfohl Landfill] do not indicate exposures to contaminants in the environmental media to be high enough to cause adverse health effects"; "*no apparent public health hazard* at the present time" (emphasis in original)).

Consistent with the tenor of these news reports, Dr. Melius, who was the director of the pertinent DOH division throughout this period, stated in his affidavit that he informed area residents that there were many possible explanations for observed incidences of cancer, including socioeconomic factors, improved screening practices, personal lifestyle, and medical history. And in the many meetings and communications with area residents, neither Dr. Melius nor any other member of DOH ever told any member of the public that the cancer cases in the area were "in any way" related to the Pfohl Brothers landfill. (*See, e.g.,* Melius Aff. ¶¶ 6, 15.)

There is no question that defendants submitted to the district court numerous documents showing that there were local concerns and controversies as to whether health problems were being caused by the

Pfohl Landfill. And if notice of controversy were the issue, defendants' motion for summary judgment would have had greater merit. But that is not the standard for determining the Federal Commencement Date, and the record did not permit the court to conclude that no reasonable factfinder could fail to infer that plaintiffs reasonably should have known prior to the end of 1991 that the Landfill was the cause of the injuries.

In sum, many studies had been done by two State agencies, DOH and DEC. There is no evidence that they found the Pfohl Landfill to cause cancers, and the record is replete with evidence that the State officials repeatedly assured residents, both through the publicized reports and in personal meetings, that there was no evidence of such causation. We cannot endorse the proposition that, as a matter of law, when reports issued by the responsible public officials stated that there was no provable link between the cancers and the Landfill, members of the public reasonably should have known to the contrary.

E. *The Length of the Limitations Period*

Finally, plaintiffs also contend that the district court ruled, erroneously, that their survival claims were governed by a one-year limitations period. We do not so interpret the court's opinion.

■■■ The FRCD preempts a more restrictive state law only with respect to the date on which a claim accrues, not with respect to the length of the limitations period. *See* 42 U.S.C. § 9658(a)(1) ("if the applicable [state or common-law] limitations period ... provides a commencement date which is earlier than the federally required commencement date, *such period* shall commence at the federally required commencement date in lieu of the [state-law] date" (emphasis added)). Thus, New York law still controls with respect to the

length of the limitations period. Section 214–c, as modified by the FRCD, gives the plaintiff one year from the date of discovery of the cause of the injury to commence a lawsuit (or three years from the date of discovery of the injury, if longer) and that provision satisfies the requirements of the FRCD.

Plaintiffs advert to statements by the district court that are somewhat elliptical standing alone. *See, e.g., Pfohl I,* 26 F.Supp.2d at 531 ("the one year period provided by § 214–c(4) will attach to the claim upon discovery of the cause of the injury, as the FRCD permits, *regardless of how much time has elapsed since the discovery of the injury* " (emphasis added)); *Pfohl II,* 68 F.Supp.2d at 249 (referring to "the proviso to § 214–c(4) limiting the benefit of the extra year within which to file a toxic tort claim to a maximum period of five years from discovery of the injury"). These statements, however, were made only in the court's discussion of the effect of the FRCD.

In directly interpreting the New York limitations periods, the court had noted that under § 214–c(4),

> if the plaintiff discovers the cause of a toxic tort injury within *five* years of the discovery of the injury, the plaintiff may invoke the longer of (a) the *three* year period from the discovery of the injury or (b) a *one* year period from the discovery of the cause within which to commence an action.

*Pfohl I,* 26 F.Supp.2d at 521 (emphasis in original); *see also Pfohl II,* 68 F.Supp.2d at 247 (" 'an action may be commenced or a claim filed within one year of such discovery of the cause of the injury,' provided less than five years have elapsed since the discovery of the injury" (emphasis omitted)). These rulings were correct, and we do not view the court's subsequent short-

hand references as overturning its direct interpretation of § 214–c.

In context, the elliptical statements quoted above were intended simply to indicate that the effect of the FRCD, where suit was not brought within three years of the discovery-of-injury date, is to allow a plaintiff to bring suit within one year after discovery of the cause of an injury, even if more than five years have elapsed since discovery of the injury. We see no indication that the district court applied a different principle.

### CONCLUSION

We have considered all of the parties' arguments in support of their respective appeals, and, except as to plaintiffs' contention that genuine issues of material fact precluded the granting of summary judgment, we have found them to be without merit. We vacate the judgment summarily dismissing the claims at issue on this appeal, and we remand for proceedings not inconsistent with this opinion.

Costs to plaintiffs.

LEVAL, J., concurring:

I concur with the majority's opinion. I agree with the majority that "Section 214–c, as modified by the FRCD, gives the plaintiff one year from the date of discovery of the cause of the injury to commence a lawsuit (or three years from the date of discovery of the injury, if longer) and that provision satisfies the requirements of the FRCD."

I write separately to note only that, in my view, the scientific knowledge proviso of § 214–c(4) is incompatible with the FRCD, and that the majority's discussion of the various possible meanings of the proviso is therefore superfluous.

The New York statute purports to establish different accrual dates for claims of personal injury caused by hazardous substances. Section 214–c(2) specifies plaintiff's discovery of the injury as the accrual date (and allows a plaintiff three years from that date). This accrual date is illegal under the FRCD because it commences at a date earlier than the "the date the plaintiff knew (or reasonably should have known)" the cause of injury. See 42 U.S.C. § 9658(b)(4)(A). Section 214–c(4), on the other hand, specifies the plaintiff's "discovery of the cause of the injury" as the accrual date (and allows one year). This provision is lawful under the FRCD because its accrual date occurs no earlier than the date the plaintiff knew or reasonably should have known the cause of the injury.

However, under the literal terms of the New York statute, § 214–c(4)'s discovery-of-cause accrual date is not always available to plaintiffs. To qualify for this accrual date, a plaintiff must satisfy two conditions. First, the discovery of the cause of injury must have occurred less than five years after discovery of the injury. If a plaintiff fails to satisfy this requirement, the timeliness of his suit is judged under § 214–c(2). The latter section, however, utilizes an accrual date that is illegal under the FRCD. Accordingly, our opinion makes clear that the district court correctly nullified the 5–year limitation. Because of the impact of the FRCD, a plaintiff may bring his suit under § 214–c(4) within one year of discovery of the cause of injury, regardless whether this occurred within 5 years of the discovery of the injury.

The second hurdle a plaintiff must clear in order to use § 214–c(4)'s discovery-of-cause accrual date is the scientific knowledge proviso. It requires a showing that "technical, scientific or medical knowledge

and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined" within three years of discovering the injury. A plaintiff who fails to make this showing is similarly relegated to the limitation period established in § 214–c(2). As noted, however, § 214–c(2)'s limitation period is unlawful because it uses an accrual date earlier than the earliest accrual date allowed by the federal statute.

The only function the scientific knowledge proviso can serve is to disqualify a plaintiff from using the lawful accrual date established by § 214–c(4), requiring the plaintiff's timeliness to be judged by the unlawful terms of § 214–c(2). The scientific knowledge proviso, like the condition requiring the discovery of cause to be within five years of the discovery of injury, cannot function lawfully; it is therefore preempted by the FRCD and must be disregarded. Accordingly, in my view the majority opinion's discussion of the different possible interpretations of the scientific knowledge proviso is superfluous and moot.

The majority opinion recognizes this problem when it states, "To the extent . . . that the scientific-knowledge provision of CPLR § 214–c(4) imposes an accrual date earlier than the date on which the plaintiff knew or reasonably should have known the cause of the injury, it is . . . preempted by the FRCD." But if the only function of the scientific knowledge proviso is to disqualify a plaintiff from using § 214–c(4)'s lawful accrual date, thereby forcing him to use the unlawful date of § 214–c(2), then the proviso cannot survive, and a debate over the different meanings the New York legislature may have intended has no useful application.